IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

NICOLE HUTCHESON, ET AL., §
§
Plaintiffs, §
§
V. § No. 3:17-cv-2021-BN
§
DALLAS COUNTY, TEXAS, ET AL., §
§
Defendants. §

## MEMORANDUM OPINION AND ORDER

At 10:30 a.m. on Saturday, August 1, 2015, Joseph Hutcheson entered the front

lobby of the Lew Sterrett Justice Center, commonly known as the Dallas County Jail.

Hutcheson, acting erratically, was eventually detained by officers, administered CPR,

and transported to Parkland Hospital, where he died at 11:31 a.m.

The medical examiner's report, referenced in the amended complaint, classified

his death "as 'homicide' caused by 'physiologic stress associated with struggle and

restraint.'" Dkt. No. 40, ¶ 4.58; *see also* Dkt. No. 42 (complete autopsy report filed in

support of motion to dismiss, concluding that, "[d]ue to the temporal relationship

between the struggle, restraint and his collapse, the manner of death is homicide").[1]

---

[1] *See also Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th
Cir. 2000) (noting that documents "attache[d] to a motion to dismiss are considered
to be part of the pleadings, if they are referred to in the plaintiff's complaint and are
central to her claim" (citation omitted)); *Delacruz v. City of Port Arthur*, No. 1:18-
CV-11, 2019 WL 1211843, at *6 (E.D. Tex. Mar. 14, 2019) (applying *Collins* to
consider an autopsy report attached to a motion to dismiss where, like here, injury
is an element of an excessive force claim).

This lawsuit, brought by Plaintiffs Nicole Hutcheson, decedent's wife at the time that he died, and Ruth Boatner, his mother, alleges that four individual defendants – Fernando Reyes, Trenton Smith, Betty Stevens, and Elvin Hayes, on the day of the incident either Detention Security Officers or Sheriff's Deputies – violated Hutcheson's constitutional right to be free from excessive force and that Defendant Dallas County failed to train its officers, making the County liable for the alleged constitutional violation under a theory of municipal liability. Plaintiffs also possibly assert a claim under Texas's wrongful death statute.

After the parties filed a written consent, the Court referred this action to the undersigned United State magistrate judge on February 14, 2019 for all further proceedings, including entry of judgment. *See* Dkt. Nos. 38 & 39; *see also* 28 U.S.C. § 636(c).

Prior to that, the Court denied Defendants' first amended motion to dismiss, and noted that, "[a]t the motion hearing held on January 17, 2019, Plaintiffs, through counsel, orally moved to amend their Complaint as to the failure to train claim and the qualified immunity issue. Defendants did not oppose the oral motion, and the Court granted the motion to amend on the record." Dkt. No. 37.

As ordered, *see id.*, Plaintiffs filed a first amended complaint, *see* Dkt. No. 40. Defendants then moved to dismiss that complaint under Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1), *see* Dkt. Nos. 41 & 42, asserting qualified immunity as the basis for dismissal by the individual defendants, *see* Dkt. No. 41 at 12-23.

The Court converted those portions of the motion to dismiss raising the

individual officer defendants' entitlement to qualified immunity to a Federal Rule of Civil Procedure 56 motion for summary judgment on each officer's qualified immunity defense. *See* Dkt. No. 43; *see also* Fed. R. Civ. P. 12(d).

The Court allowed Plaintiffs to file a motion for leave to conduct limited discovery in order to respond to the qualified immunity issues raised in the converted summary judgment motion. *See* Dkt. No. 43. And, after Plaintiffs filed their motion for leave, *see* Dkt. No. 46, and Defendants responded, *see* Dkt. No. 47, the Court denied the motion, *see Hutcheson v. Dallas Cnty., Tex.*, No. 3:17-cv-2021-BN, 2019 WL 1957997 (N.D. Tex. May 2, 2019) ("Plaintiffs' attempt to obtain any evidence that may support a version of the facts that may defeat summary judgment on qualified immunity does not fit within the limited scope of a discovery request 'narrowly tailored to uncover only those facts needed to rule on the immunity claim,'" because "open-ended requests – to uncover any facts, as opposed to specific questions of fact, that may be helpful to their version of events – fail to advance the second step of the 'careful procedure'" established by the United States Court of Appeals for the Fifth Circuit. (citations omitted)).

Plaintiffs then filed a court-ordered response to the motion to dismiss and (as converted in part) for summary judgment. *See* Dkt. No. 52. And Defendants replied. *See* Dkt. No. 55.

For the reasons explained below, the Court GRANTS the motion to dismiss and converted motion for summary judgment as to qualified immunity and therefore DISMISSES this action with prejudice.

**Legal Standards and Analysis**

I.   <u>Motion to Dismiss as to Municipal Liability</u>

    A.    **Legal Standards**

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted, the Court "accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205-06 (5th Cir. 2007). But a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and must plead those facts with enough specificity "to raise a right to relief above the speculative level," *id.* at 555.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "A claim for relief is implausible on its face when 'the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.'" *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 679); *see also Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 899 (5th Cir. 2019) ("Where the well-pleaded facts of a complaint do not permit a court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]'

– 'that the pleader is entitled to relief.'" (quoting *Iqbal*, 556 U.S. at 678 (quoting, in turn, FED. R. CIV. P. 8(a)(2)))).

While, under Federal Rule of Civil Procedure 8(a)(2), a complaint need not contain detailed factual allegations, a plaintiff must allege more than labels and conclusions, and, while a court must accept all of a plaintiff's allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). A threadbare or formulaic recitation of the elements of a cause of action, supported by mere conclusory statements, will not suffice. *See id*. Instead, "to survive a motion to dismiss" under *Twombly* and *Iqbal*, a plaintiff need only "plead facts sufficient to show" that the claims asserted have "substantive plausibility" by stating "simply, concisely, and directly events" that the plaintiff contends entitle him or her to relief. *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 12 (2014) (per curiam) (citing FED. R. CIV. P. 8(a)(2)-(3), (d)(1), (e)); *see also Inclusive Communities Project*, 920 F.2d at 899 ("'Determining whether a complaint states a plausible claim for relief' is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" (quoting *Iqbal*, 556 U.S. at 679; citing *Robbins v. Oklahoma*, 519 F.3d 1242, 1248 (10th Cir. 2008) ("[T]he degree of specificity necessary to establish plausibility and fair notice, and therefore the need to include sufficient factual allegations, depends on context.")).

Aside from "matters of which judicial notice may be taken under Federal Rule of Evidence 201," *Inclusive Communities Project*, 920 F.2d at 900 (citations omitted),

a court cannot look beyond the pleadings in deciding a Rule 12(b)(6) motion. *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). Pleadings in the Rule 12(b)(6) context include attachments to the complaint. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). Documents "attache[d] to a motion to dismiss are considered to be part of the pleadings, if they are referred to in the plaintiff's complaint and are central to her claim." *Collins*, 224 F.3d at 498-99 (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)).

While the Fifth Circuit "has not articulated a test for determining when a document is central to a plaintiff's claims, the case law suggests that documents are central when they are necessary to establish an element of one of the plaintiff's claims. Thus, when a plaintiff's claim is based on the terms of a contract, the documents constituting the contract are central to the plaintiff's claim." *Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 662 (N.D. Tex. 2011). "However, if a document referenced in the plaintiff's complaint is merely evidence of an element of the plaintiff's claim, then the court may not incorporate it into the complaint." *Id.*

And a plaintiff may not amend his allegations through a response to a motion to dismiss. "[A] claim for relief" must be made through a pleading, FED. R. CIV. P. 8(a), and a response to a motion is not among the "pleadings [that] are allowed" under the Federal Rules of Civil Procedure, FED. R. CIV. P. 7(a); *see, e.g., Klaizner v. Countrywide Fin.*, No. 2:14-CV-1543 JCM (PAL), 2015 WL 627927, at *10 (D. Nev. Feb. 12, 2015) ("All claims for relief must be contained in a pleading. A response to a motion is not a pleading and it is improper for the court to consider causes of action not contained in

the pleadings." (citations omitted)).

**B.    Analysis**

"A municipality and/or its policymakers may be held liable under § 1983 'when execution of a government's policy or custom ... by those whose edicts or acts may fairly be said to represent official policy, inflicts the [constitutional] injury.'" *Salazar-Limon v. City of Houston*, 826 F.3d 272, 277 (5th Cir. 2016) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); citation omitted). That is, "[t]here is no vicarious municipal liability under § 1983; rather, plaintiffs 'must prove that "action pursuant to official municipal policy" caused their injury.'" *Three Legged Monkey, L.P. v. City of El Paso, Tex.*, 652 F. App'x 236, 239 (5th Cir. 2016) (quoting *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting, in turn, *Monell*, 436 U.S. at 691)).

To assert liability under *Monell*, a plaintiff must allege "(1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009) (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)).

"Official policy can arise in various forms. It usually exists in the form of written policy statements, ordinances, or regulations, but may also arise in the form of a widespread practice that is 'so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *James v. Harris Cnty.*, 577 F.3d 612, 617 (5th Cir. 2009) (quoting *Piotrowski*, 237 F.3d at 579 (quoting, in turn, *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc))).

"To proceed beyond the pleading stage, a complaint's 'description of a policy or

custom and its relationship to the underlying constitutional violation ... cannot be conclusory; it must contain specific facts.'" *Peña v. City of Rio Grande City*, 879 F.3d 613, 622 (5th Cir. 2018) (quoting *Spiller v. City of Tex. City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997); footnote omitted); *see also Pinedo v. City of Dallas, Tex.*, No. 3:14-cv-958-D, 2015 WL 5021393, at *5 (N.D. Tex. Aug. 25, 2015) ("To establish a custom, a plaintiff must demonstrate (and, at the pleading stage, must plausibly plead) 'a pattern of abuses that transcends the error made in a single case.'" (quoting *Piotrowski*, 237 F.3d at 582)).

Plaintiffs contend that, under *Monell*, the County is liable for its failure to train the four individual defendants here. *See* Dkt. No. 40 at 10-12, 16-18.

"Failure to train is a separate theory of municipal liability, but the same standard applies both to a failure to train claim and to a municipal liability claim." *Pinedo*, 2015 WL 5021393, at *9 (citations omitted); *cf. Anderson v. Marshall Cnty., Miss.*, 637 F. App'x 127, 134 (5th Cir. 2016) (per curiam) ("Even within the difficult world of *Monell* liability, failure-to-train claims are especially difficult to establish." (citing *Connick*, 563 U.S. at 61 ("A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."))).

Plaintiffs allege the following facts to support their failure-to-train theory of municipal liability:

> The Dallas County Sheriff's Department's General Orders instruct law enforcement and detention personnel that the head and neck area are considered "no-impact zones" unless deadly force is justified, due to the high risk of serious injury or death to the suspect.
> The Dallas County Sheriff's Department's General Orders instruct

law enforcement and detention personnel that after suspects are handcuffed, they should be sat upright or placed on their side to prevent what is known as "positional asphyxia."

The Dallas County Sheriff's Department's General Orders instruct law enforcement and detention personnel that "hog tying" suspects (the act of forcing their legs against their buttocks) has been banned nationwide for decades because of its tendency to cause "positional asphyxia."

The Dallas County Sheriff's Department's General Orders instruct law enforcement and detention personnel on how to accommodate their usual practices when encountering suspects who are mentally ill or those who suffer from a drug-induced psychosis.

The Dallas County Sheriff's Department's General Orders instruct law enforcement and detention personnel to use de-escalation techniques when confronting suspects who are unarmed and are not a physical danger to themselves or others.

The Dallas County Sheriff's Department's General Orders instruct law enforcement and detention personnel to provide CPR properly to nonresponsive suspects.

In a January 2011 article from PoliceOne.com entitled "Key Considerations for Good Use of Force Policies," Terrance P. Dwyer, a 22-year veteran of the New York State Police, a licensed attorney, and a tenured Professor in the Justice and Law Administration Department at Western Connecticut State University, wrote:

> Merely having a policy in place is not enough; it must be implemented and followed. Ideally the Policy and the Practice should mirror each other. Having a policy in place on the use of force but not training officers in the proper execution of that policy can lead to liability for an unconstitutional policy by failing to train or to supervise. These claims may give rise to a claim of deliberate indifference against supervisors and the municipality, which is akin to alleging an unwritten policy of unconstitutional behavior.

Accordingly, the Dallas County policymakers who order and/or provide the training discussed in paragraphs 4.61 to 4.66 must take affirmative measures to ensure that the law enforcement and detention personnel who *receive* the training *actually* retain the information provided in the training.

Similarly, the Dallas County policymakers who order and/or provide the training discussed in paragraphs 4.61 to 4.66 must take affirmative measures to ensure that the law enforcement and detention personnel who *receive* the training *actually* perform their duties in

-9-

accordance with that training.

Dkt. No. 40, ¶¶ 4.61-4.69.

> "[T]he failure to provide proper training may fairly be said to represent a policy for which the [municipality] is responsible, and for which [it] may be held liable if it actually causes injury." "In resolving the issue of a [municipality's] liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." A plaintiff must [allege and – then ultimately – ]show that (1) the municipality's training policy or procedure was inadequate; (2) the inadequate training policy was a "moving force" in causing violation of plaintiff's rights; and (3) the municipality was deliberately indifferent in adopting its training policy.

*Shumpert v. City of Tupelo*, 905 F.3d 310, 317 (5th Cir. 2019) (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989); then citing *Sanders-Burns v. City of Plano*, 594 F.3d 366, 381 (5th Cir. 2010); *Valle v. City of Houston*, 613 F.3d 536, 544 (5th Cir. 2010); *Pineda v. City of Houston*, 291 F.3d 325, 332 (5th Cir. 2002)).

As for the second requirement, "'the connection must be more than a mere 'but for' coupling between cause and effect.' 'The deficiency in training must be the actual cause of the constitutional violation.'" *Id.* (quoting *Valle*, 613 F.3d at 546).

And "[d]eliberate indifference is a stringent standard, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Valle*, 613 F.3d at 547. As such, "a plaintiff must [allege – and then ultimately – ]show that

> in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

*Wright v. City of Garland, Tex.*, No. 3:10-cv-1852-D, 2014 WL 5878940, at *4-*5 (N.D.

Tex. Nov. 13, 2014) (quoting *Valle*, 613 F.3d at 547 (quoting, in turn, *City of Canton*, 489 U.S. at 390)).

> Deliberate indifference may be found in two types of situations: (1) a general failure to provide adequate training in light of the foreseeable serious consequences that could result, and (2) a municipality fails to act in response to the specific need to train a particular officer. *See City of Canton*, 489 U.S. at 390; *Brown v. Bryan Cnty.*, 219 F.3d 450, 457 (5th Cir. 2000).

*Hobart v. Estrada*, 582 F. App'x 348, 357 (5th Cir. 2014) (citations modified).

Plaintiffs do not allege that the County failed to respond to a specific need to train any particular officer defendant. Their complaint therefore appears to invoke the first situation, which "usually" would also require allegations to "show a pattern of similar violations." *Id.* (citing *Valle*, 613 F.3d at 547); *see also Littell v. Houston Indep. Sch. Dist.*, 894 F.3d 616, 624 (5th Cir. 2018) ("This proof-by-pattern method is 'ordinarily necessary.'" (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 409, 117 (1997))). Plaintiffs allege no pattern of similar violations.

> But even absent proof of pattern, deliberate indifference can still be inferred if the factfinder determines that the risk of constitutional violations was or should have been an "obvious" or "highly predictable consequence" of the alleged training inadequacy. Such an inference is possible in only very narrow circumstances: The municipal entity must have "fail[ed] to train its employees concerning a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face."
>
> Thus, for example, if a city policymaker opts to provide no training whatsoever to police officers concerning the established and recurring constitutional duty not to use excessive deadly force, a factfinder may reasonably infer that the city acted with the requisite deliberate indifference. The [United States] Supreme Court explained as much in *Canton*, by way of hypothetical:
>
>> [C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The

-11-

> city has armed its officers with firearms, in part to allow
> them to accomplish this task. Thus, the need to train
> officers in the constitutional limitations on the use of deadly
> force, can be said to be "so obvious[ ]" that failure to do so
> could properly be characterized as "deliberate indifference"
> to constitutional rights.

"Under those circumstances there is an obvious need for some form of
training." Otherwise, the Supreme Court has said, there would be "no
way for novice officers to obtain the legal knowledge they require" to
conform their behavior to their clear and recurring constitutional
obligations.

*Littell*, 894 F.3d at 624-25 (citations and footnote omitted); *see also Anderson*, 637 F.

App'x at 134-35 ("To qualify for the single incident exception, [Plaintiffs] must show

that [Dallas] County's training was so inadequate that the [C]ounty should have

predicted that an untrained officer would have [harmed Hutcheson] in the way [the

officer defendants] allegedly did. Importantly, '[i]t is not enough to say that more or

different training or supervision would have prevented' [his death]. More specificity is

required to resolve such a claim." (quoting *Estate of Davis ex rel. McCully v. City of N.

Richland Hills*, 406 F.3d 375 (5th Cir. 2005))).

In sum, to plead *Monell* liability under the single-incident exception where

deliberate indifference is based on a general failure to provide adequate training, a

plaintiff must allege factual content showing (or from which it may be inferred) that

the training provided by the municipality was so inadequate that it should have

predicted that those deficiencies would have caused the specific harm alleged, not that

more or different training would have prevented it.

Measured against these standards, Plaintiffs' pleading is deficient. Based on the

facts alleged, as set out above, they assert:

If Dallas County failed to train its law enforcement and detention personnel on the mandates discussed in paragraphs 4.61 to 4.66, above, it acted with deliberate indifference to Mr. Hutcheson's constitutionally protected rights, because the consequences of failing to provide such training are known or obvious.

Alternatively, if Dallas County provided its law enforcement and detention personnel with the training discussed in paragraphs 4.61 to 4.66, but failed to ensure that its law enforcement and detention personnel *actually* retained the information provided in the training, it acted with deliberate indifference to Mr. Hutcheson's constitutionally protected rights, because the consequences of failing to ensure that its officers understood the training they received are known or obvious.

Alternatively, if Dallas County provided its law enforcement and detention personnel with the training discussed in paragraphs 4.61 to 4.66, but failed to ensure that its law enforcement and detention personnel *actually* performed their duties in accordance with the information provided in the training, it acted with deliberate indifference to Mr. Hutcheson's constitutionally protected rights, because the consequences of failing to ensure that its officers comply with the training are known or obvious.

The fact that this incident occurred at all demonstrates the obvious need for Dallas County to provide its officers with additional or different training.

But for Dallas County's failure to train law enforcement and detention personnel with mandates discussed in paragraphs 4.61 to 4.66, or alternatively, its failure to ensure that its officers understood these mandate they received, or alternatively, its failure to ensure that its officers complied with these mandates, directly caused (and was therefore a "moving force") of Joseph Hutcheson's death because, had they acted in accordance with these mandates, Joseph Hutcheson would not have suffered the "physiologic stress associated with struggle and restraint," which the medical examiner identified as a cause of his death.

Dkt. No. 40, ¶¶ 5.21-5.25.

In their response to Dallas County's motion to dismiss, "Plaintiffs concede that they have not alleged a pattern of similar incidents" but take issue with the County's argument that they did not allege that the County failed to train its officers: "that is exactly what Plaintiffs have alleged in paragraph 5.21 of its amended complaint: 'If

Dallas County failed to train its law enforcement and detention personnel on the mandates discussed ... above, it acted with deliberate indifference to Mr. Hutcheson's constitutionally protected rights, because the consequences of failing to provide such training are known or obvious.'" Dkt. No. 52 at 30-31.

But that allegation is not the same as the hypothetical posed in *Canton*, in which the United States Supreme Court discussed broad training on an area of the law, "the constitutional limitations on the use of deadly force," not the failure to train as to specified subjects within a broader subject matter – such as those Plaintiffs set out in paragraphs 4.61-4.66 of the amended complaint.

For example, a panel of the Fifth Circuit found that *Canton*'s single-incident hypothetical applied to the allegations in *Littell*, where

> the alleged facts, taken together and assumed to be true, permit the reasonable inference – i.e., the claim has facial plausibility – that the risk of public officials' conducting unconstitutional searches was or should have been a "highly predictable consequence" of the school district's decision to provide its staff no training regarding the Constitution's constraints on searches. Indeed, Plaintiffs' allegations mirror *Canton*'s hypothetical in all material respects.

*Littell*, 894 F.3d at 625; *see id.* at 626-27 ("In these circumstances, the Supreme Court has said, 'there is an obvious need for some form of training.' But, critically, the school district here allegedly provides 'no training whatsoever' as to how to conduct a lawful search. This straightforward factual allegation carries straightforward doctrinal consequences. It means that, for purposes of resolving the school district's motion to dismiss, we must assume that this is not a case in which "an otherwise sound [training] program has occasionally been negligently administered," or in which an

officer received appropriate training that she then failed properly to obey. Nor do Plaintiffs rely on only a 'nuance[d]' flaw in an existing training regime, or attempt to derive municipal liability from the mere fact that 'additional training would have been helpful.' Instead, we must credit Plaintiffs' factual allegations and proceed on the assumption that the school district has made the conscious choice to take no affirmative steps to instruct any of its employees on the constitutional rules governing student searches – even though at least some of those employees are regularly called upon to conduct such searches. In short, this case presents an alleged 'complete failure to train' of the kind we have found actionable. Plaintiffs' allegations of deliberate indifference survive a motion to dismiss." (citations omitted)).

At most, Plaintiffs' factual allegations raise an inference that, had the County provided more adequate training as to the specific general orders Plaintiffs cite, or had the County more competently administered its training program, the harm could have been prevented.

But, as the cases discussed above explain, such allegations do not reflect that the County consciously chose to not train its officers – "not even at all" – as to the use of deadly force. *Jason v. Tanner*, 938 F.3d 191, 199 (5th Cir. 2019) ("We found that the facts [in *Littell*] 'mirror[ed] *Canton*'s hypothetical in all material respects.' But here, there was training. There was also a monitoring system in place. Again, it just failed to prevent the attack. Put differently: square peg, round hole. *Littell* was about a supervisor who didn't train his subordinates; not even at all. Had he adequately trained them, they would've known not to strip search young girls." (footnote omitted)).

As such, the amended complaint fails to plausibly allege *Monell* liability under the facts and the theory that Plaintiffs advance. The Court therefore grants Dallas County's motion to dismiss with prejudice, as Plaintiffs have already been afforded an opportunity to amend their allegations against the County.

## II.     Motion for Summary Judgment as to Qualified Immunity

Qualified immunity is only "nominally an affirmative defense." *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008). In reality, it is an immunity from suit and must therefore be resolved "at the earliest possible stage." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) ("[B]ecause the entitlement is an immunity from suit rather than a mere defense to liability, we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation.").

It may be raised and considered through a motion on the pleadings, and when this occurs, the Court focuses on the sufficiency of a plaintiff's pleadings to resolve the factual prong of the analysis. *See, e.g., McLin v. Ard*, 866 F.3d 682, 688 (5th Cir. 2018) ("When the motion to dismiss raises the defense of qualified immunity, the plaintiff 'must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm ... alleged and that defeat a qualified immunity defense with equal specificity.'" (quoting *Zapata v. Melson*, 750 F.3d 481, 485 (5th Cir. 2014) (quoting, in turn, *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012)))); *cf. Shaw v. Villanueva*, 918 F.3d 414, 416-17 (5th Cir. 2019) ("When a defendant asserts qualified immunity, the plaintiff bears the burden of pleading facts that demonstrate liability and defeat immunity." (citing *Zapata*, 750 F.3d at 485;

*McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc) (per curiam))).

But considering the nominal affirmative defense in this posture is difficult if, like here, the record reflects that a video of the use-of-force incident exists, *see* Dkt. Nos. 27, 28, because, to the extent that the video "'discredits [Plaintiffs'] description of facts, a court will[ – at least by the summary-judgment stage – ]consider the facts in the light depicted by the videotape,'" *Shepherd v. Shreveport*, 920 F.3d 278, 283 (5th Cir. 2019) (quoting *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011)); *see also Scott v. Harris*, 550 U.S. 372, 381 (2007).

The existence of the video – and its centrality to whether qualified immunity attaches to any officer defendant's actions – prompted the Court to convert those portions of the motion to dismiss raising entitlement to qualified immunity to a Rule 56 motion for summary judgment on each officer's qualified immunity defense. *See* Dkt. No. 43. This conversion (and the Court's granting Plaintiffs an opportunity to move for leave to conduct focused qualified immunity discovery) also furthered the Supreme Court's mandate that lower federal courts must resolve an entitlement to qualified immunity at the earliest possible stage of the litigation. Here, it would have made little sense to address qualified immunity on the pleadings, ignoring the video, and then, if the defense was not resolved on the pleadings, to consider the video in ruling on a later-filed motion for summary judgment.

The Court explains this preliminarily because it seems that Plaintiffs may misunderstand how "[a] good-faith qualified immunity defense alters the usual

summary judgment burden of proof." *Valderas v. City of Lubbock*, 937 F.3d 384, 389

(5th Cir. 2019) (per curiam).

Plaintiffs explain in their response to the converted summary judgment motion

that it is somewhat difficult to "respond" to arguments that the individual
defendants never actually made. The substance of section 1-A of their
amended motion to dismiss is devoted to rehashing the allegations in
Plaintiffs' amended complaint and then arguing that the allegations did
not assert a plausible claim for relief, (as if Plaintiffs had admitted that
the force used was "minimal" and "routine.") The individual Defendants
further argued that Plaintiffs' allegations did not describe objectively
unreasonable conduct – or in the alternative, that it did not violate
clearly established law.

Because the individual Defendants never filed a motion for
summary judgment, they never advanced an argument that either (a) the
evidence filed in support of their motion to dismiss conclusively
establishes the absence of a fact issue on either of these elements; or (b)
that Plaintiffs cannot come forward with any evidence that would do so.
It is well-established that a court may not grant a motion for summary
judgment on a ground not stated in the motion. But in light of this
Court's order denying Plaintiffs an opportunity for limited discovery and
requesting a response to the motion as it presently stands, Plaintiffs
presume that the individual Defendants are arguing that the [ ] evidence
they filed in support of their motion to dismiss conclusively establishes
the absence of a material fact on the elements of this defense.

To that end, if the individual Defendants believe that an entirely
silent video "conclusively establishes" their qualified-immunity defense,
they are mistaken. Last year, the Fifth Circuit in *Darden v. City of Fort
Worth, Texas*, ... not only held that "a police officer uses excessive force
when the officer strikes, punches, or violently slams a suspect who is not
resisting arrest," it also held that this law was "clearly established" for an
incident that occurred in May 2013 – more than two years before the
incident that is the subject of this suit. Accordingly, if the evidence that
Defendants produced shows that Joseph was not resisting arrest at the
time he was first slammed to the ground, Defendants are not entitled to
summary judgment on their qualified immunity defense.

Dkt. No. 52 at 9-10 (footnotes and emphasis omitted).

Unlike a traditional affirmative defense when considered at summary judgment,

where its movant "must establish beyond peradventure *all* of the essential elements of the ... defense to warrant judgment in his favor," *Fontenot v. Upjohn Co.*,780 F.2d 1190, 1194 (5th Cir. 1986), once a defendant asserts qualified immunity – regardless how – the burden shifts to the plaintiff "to demonstrate the inapplicability of the defense," *McClendon*, 305 F.3d at 323. So, here, although the Court will "view the evidence in the light most favorable to the nonmoving party[ – except to the extent that video evidence discredits the nonmovant's pleaded facts – ]the plaintiff bears the burden of demonstrating that a defendant is not entitled to qualified immunity." *Valderas*, 937 F.3d at 389 (citation omitted); *compare id.* ("'To negate a defense of qualified immunity and avoid summary judgment, the plaintiff need not present "absolute proof," but must offer more than "mere allegations."'" (quoting *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009) (quoting, in turn, *Reese v. Anderson*, 926 F.2d 494, 499 (5th Cir. 1991)))), *with Mendez v. Poitevent*, 823 F.3d 326, 331 (5th Cir. 2016) (noting that the burden at summary judgment "'to rebut a claim of qualified immunity once the defendant has properly raised it in good faith' ... 'is a demanding [one]'" (citations omitted)).

### A.    Legal Standards

"A plaintiff makes out a § 1983 claim if he 'shows a violation of the Constitution or of federal law, and then shows that the violation was committed by someone acting under color of state law,'" *Rich v. Palko*, 920 F.3d 288, 293-94 (5th Cir. 2019) (quoting *Brown v. Miller*, 519 F.3d 231, 236 (5th Cir. 2008); brackets omitted). "But government officials performing discretionary duties" can respond to such a claim by asserting

qualified immunity. *Id.* at 294 (citing *Haverda v. Hays Cnty.*, 723 F.3d 586, 598 (5th Cir. 2013)). If they do, a court must consider each official's actions separately. *See, e.g., Meadours v. Ermel*, 483 F.3d 417, 421-22 (5th Cir. 2007).

"Qualified immunity attaches when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam)); *accord Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (per curiam) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011); internal quotation marks omitted); *accord City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 135 S. Ct. 1765, 1774 (2015); *cf. Rich*, 920 F.3d at 294 ("In sum, QI 'represents the norm, and courts should deny a defendant immunity only in rare circumstances.'" (quoting *Romero v. City of Grapevine*, 888 F.3d 170, 176 (5th Cir. 2018))); *Morrow v. Meachum*, 917 F.3d 870, 876 (5th Cir. 2019) (Courts "must think twice before denying qualified immunity.").

Review of a motion for summary judgment based on qualified immunity is accomplished in two steps, and, while a court may conduct the required two-step examination in any order, *see Pearson*, 555 U.S. at 236, "deciding the two prongs in order 'is often beneficial,'" *Darden v. City of Fort Worth*, 866 F.3d 698, 702 (5th Cir. 2017) (quoting *Pearson*, 555 U.S. at 236).

Regardless which prong is addressed first, a court must decide "whether the facts, taken in the light most favorable to the plaintiff, show the officer's conduct violated a federal constitutional or statutory right." *Luna v. Mullenix*, 773 F.3d 712, 718 (5th Cir. 2014) (citing *Tolan v. Cotton*, 572 U.S. 650, 655-56 (2014) (per curiam); *Flores v. City of Palacios*, 381 F.3d 391, 395 (5th Cir. 2004)), *reversed on other grounds*, 136 S. Ct. 305 (2015). Put differently, under the first prong, a court simply must decide "whether the plaintiff has alleged a violation of a constitutional right." *Charles v. Grief*, 522 F.3d 508, 511 (5th Cir. 2008).

A court must also decide "whether the defendant's actions violated clearly established statutory or constitutional rights of which a reasonable person would have known." *Flores*, 381 F.3d at 395. This second prong of the analysis requires a court to determine "whether the defendant's conduct was objectively reasonable in light of the clearly established law at the time of the incident." *Charles*, 522 F.3d at 511. That is, "whether it would have been clear to a reasonable [official] in the [defendants'] position that their conduct was unlawful in the situation they confronted." *Wood v. Moss*, 572 U.S. 744, 758 (2014) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001); internal quotation marks and original brackets omitted); *see also Mullenix*, 136 S. Ct. at 308 ("[a] clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right'"(quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012))).

> This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix*, 136 S. Ct. at 308 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198-99 (2004)). The [United

States] Supreme Court does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741 "It is the plaintiff's burden to find a case in [her] favor that does not define the law at a 'high level of generality.'" *Vann v. City of Southaven*, 884 F.3d 307, 310 (5th Cir. 2018) (quoting *Cass v. City of Abilene*, 814 F.3d 721, 733 (5th Cir. 2016)).

*Bustillos v. El Paso Cnty. Hosp. Dist.*, 891 F.3d 214, 222 (5th Cir. 2018) (citations modified).[2]

The Supreme Court recently explained this inquiry in the Fourth Amendment context:

Where constitutional guidelines seem inapplicable or too remote, it does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness. An officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." That is a necessary part of the qualified-immunity standard.

*Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam) (quoting *Plumhoff v.*

---

[2] *See also Morgan v. Swanson*, 659 F.3d 359, 371-72 (5th Cir. 2011) (en banc) (A court "must be able to point to controlling authority – or a robust consensus of persuasive authority – that defines the contours of the right in question with a high degree of particularity." (footnote and internal quotation marks omitted)); *Lincoln v. Turner*, 874 F.3d 833, 850 (5th Cir. 2017) ("While we may look to other circuits to find clearly established law, we must consider 'the overall weight' of such authority. A 'trend' alone is just that. As of December 2013, only two circuits had weighed in on the 'contours of the right.' These cases alone do not provide sufficient authority to find that the law was clearly established." (footnote omitted)); *Bustillos*, 891 F.3d at 222 (holding that the plaintiff failed to shoulder her burden to "point[] ... to any case that shows, in light of the specific context of this case, that the [defendants'] conduct violated clearly established law" and that, although the court's "independent review [ ] uncovered" persuasive authority, "a single, fifty year old case from another circuit is [not] sufficient in this instance to have 'placed the ... constitutional question [at issue] beyond debate'" (quoting *al-Kidd*, 563 U.S. at 741)).

*Rickard*, 572 U.S. 765, 778-79 (2014); reversing denial of summary judgment on a qualified immunity defense); *see also Sause v. Bauer*, 138 S. Ct. 2561, 2562-63 (2018) (per curiam) (reversing dismissal of a *pro se* complaint based on the defendants' entitlement qualified immunity where the district court failed to liberally interpret the Fourth Amendment claims).

### B.    Analysis

"To prevail on a Section 1983 excessive force claim, 'a plaintiff must establish: (1) injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.'" *Shepherd*, 920 F.3d at 283 (quoting *Harris v. Serpas*, 745 F.3d 767, 772 (5th Cir. 2014) (quoting, in turn, *Ramirez v. Knoulton*, 542 F.3d 124, 128 (5th Cir. 2008)); citing *Graham v. Connor*, 490 U.S. 386, 393-97 (1989)).

> Accidental contact between an officer and a civilian is not a Fourth Amendment seizure – even if it injures the civilian – so a § 1983 plaintiff claiming excessive force must show that force was applied intentionally. *See Brower v. Cnty. of Inyo*, 489 U.S. 593, 596-97 (1989) (explaining that a seizure occurs only when a suspect's "freedom of movement" is terminated "through means intentionally applied" by the governmental actor); *Gorman v. Sharp*, 892 F.3d 172, 175 (5th Cir. 2018) (holding there can be no § 1983 liability for excessive force "in the absence of intentional conduct"). And even if the seizure involves intentional conduct, the district court must consider whether it was unreasonable under the specific circumstances of the seizure. *See, e.g., City of Escondido v. Emmons*, 139 S. Ct. 500, 503-04 (2019) (per curiam) (reversing the denial of qualified immunity where officers threw a man to the ground during an arrest).

*McDonald v. McClelland*, 779 F. App'x 222, 225-26 (5th Cir. 2019) (per curiam).

In excessive-force claims under the Fourth Amendment, the reasonableness of an official's conduct depends on "the facts and

circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The court must adopt "the perspective of a reasonable officer on the scene, rather than [judge] with the 20/20 vision of hindsight." *Id.* "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 396-97. "As in other Fourth Amendment contexts, however, the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

*Brothers v. Zoss*, 837 F.3d 513, 518-19 (5th Cir. 2016) (footnote omitted).

Plaintiffs allege:

> Mr. Hutcheson entered the lobby wearing a ball cap, Dallas Cowboys jersey, and shorts.
> Mr. Hutcheson appeared to be panicked when he entered the lobby.
> Mr. Hutcheson appeared to be physically unstable when he entered the lobby.
> It was clear that Mr. Hutcheson had nothing in his hands when he entered the lobby.
> It was clear that Mr. Hutcheson was not armed with any type of weapon when he entered the lobby.
> Mr. Hutcheson did not make any threats to anyone after he entered the lobby.
> Immediately after Mr. Hutcheson entered the lobby, he slowed his pace, walked towards a single row of benches along the wall, and sat down.
> As Mr. Hutcheson entered the lobby, he stated to numerous individuals, "It's okay," "I'm not going to hurt anyone," and "I need some help."
> Several of the individuals to whom Mr. Hutcheson spoke directed him towards Defendant Hayes, a Detention Security Officer who was present in the lobby.
> Defendant Hayes approached Mr. Hutcheson and engaged him in conversation.
> Defendant Reyes, a Dallas County Sherriff's Deputy, was working

in the lobby's information booth when Mr. Hutcheson entered the lobby.

After seeing Mr. Hutcheson speaking to Defendant Hayes, Defendant Reyes left the information booth walked towards them.

Mr. Hutcheson calmly walked away from both Defendants Reyes and Hayes and re-took a seat on the bench.

Defendants Reyes and Hayes followed Mr. Hutcheson and began to talk to him as he was seated.

While seated, Mr. Hutcheson showed Defendants Reyes and Hayes that he had nothing in his hands and no weapons in his pockets.

After approximately thirty seconds, Mr. Hutcheson stood up and began to follow Defendant Reyes towards the information booth.

Following the conversation with Mr. Hutcheson and Defendant Reyes, Defendant Hayes left the building.

Following the conversation with Mr. Hutcheson and Defendant Hayes, Defendant Reyes returned to the information booth.

Following the conversation with Defendant Reyes and Defendant Hayes, Mr. Hutcheson began to pace around the lobby.

While pacing around the lobby, Mr. Hutcheson did not make physical contact with anyone.

While pacing around the lobby, Mr. Hutcheson did not say anything to anyone.

While pacing around the lobby, Mr. Hutcheson repeatedly grabbed his abdomen.

While pacing around the lobby, Mr. Hutcheson appeared physically unstable.

While pacing around the lobby, Mr. Hutcheson appeared to be in a state of distress.

....

While he was pacing around the lobby, neither Defendant Stevens nor Defendant Smith – both of whom were working as Detention Security Officers in the lobby – appeared concerned with Mr. Hutcheson's behavior.

Upon seeing Mr. Hutcheson pacing in the lobby, Defendant Reyes quickly left the information booth and directly approached Mr. Hutcheson.

Defendant Reyes did not make verbal contact with Defendant Stevens or Defendant Smith before approaching Mr. Hutcheson.

Immediately upon approaching Mr. Hutcheson, Defendant Reyes grabbed Mr. Hutcheson by the arms and torso and attempted to force Mr. Hutcheson onto the ground.

Mr. Hutcheson turned away from Defendant Reyes with his arms extended, his hands open, and his palms facing down.

Defendant Reyes's grabbed Mr. Hutcheson from behind forcing Mr.

Hutcheson's feet out from under him, and Mr. Hutcheson landed on his buttocks on the lobby floor.

Once Mr. Hutcheson's buttocks were on the floor, Defendant Reyes attempted to turn Mr. Hutcheson over so that he was in a prone position (face down) on the lobby floor.

After Defendant Reyes turned Mr. Hutcheson to a prone position, Defendants Stevens and Smith ran over to assist Defendant Reyes.

Defendant Smith placed his knee on Mr. Hutcheson's shoulder and neck area while leaning forward and placing pressure on Mr. Hutcheson.

Defendant Reyes attempted to place Mr. Hutcheson in handcuffs.

To assist Defendant Reyes, Defendant Stevens placed her knee on Mr. Hutcheson's back.

While Defendants Reyes, Smith, and Stevens were engaged in the above, Mr. Hutcheson was [writhing] in pain.

While Defendants Reyes, Smith, and Stevens were engaged in the above, Mr. Hutcheson was screaming in pain.

After Defendants Reyes, Smith, and Stevens handcuffed Mr. Hutcheson, they allowed him to remain lying on the floor of the lobby in a prone position for more than two minutes.

While Mr. Hutcheson was handcuffed and lying on the floor of the lobby in a prone position, Defendant Hayes returned to the lobby and immediately stepped on Mr. Hutcheson's feet.

Defendant Hayes then grabbed Mr. Hutcheson's feet, crossed Mr. Hutcheson's legs, pushed Mr. Hutcheson's feet towards Mr. Hutcheson's buttocks, and held them there for approximately thirty seconds.

After Defendant Hayes released Mr. Hutcheson's legs, Mr. Hutcheson does not move again by his own volition.

Defendants placed Mr. Hutcheson into a seated position for nearly ninety seconds after Defendant Hayes released him.

After Defendants placed Mr. Hutcheson in a seated position, they had to support him to keep him from falling over.

While Mr. Hutcheson was in a seated position, Defendants tapped and nudged Mr. Hutcheson's shoulder, but obtained no visible or audible response.

Four minutes after Defendants placed Mr. Hutcheson in a seated position, a nurse arrived in the lobby, but he did not administer first aid nor perform CPR.

CPR was not administered to Mr. Hutcheson for more than seven minutes after Defendant Hayes released him.

Mr. Hutcheson was eventually transported to Parkland Hospital.

Mr. Hutcheson died at Parkland Hospital at 11:31 a.m.

The medical examiner's report noted a six-inch bruise on the back of Mr. Hutcheson's neck.

> The medical examiner's report noted that Mr. Hutcheson sustained fractured ribs as a result of the CPR.
>
> The medical examiner's report classified the Mr. Hutcheson's death as a "homicide" caused by "physiologic stress associated with struggle and restraint."

Dkt. No. 40, ¶¶ 4.04-4.26, 4.34-4.60; *see also* Dkt. No. 42 (autopsy report) at 9 (explaining that, "[p]er medical records, the decedent left Parkland Hospital on August 1, 2015 at 9:48 am after presenting to the emergency department complaining of abdominal pain following methamphetamine use" and concluding that he "died as a result of the combined toxic effects of cocaine and methamphetamine," which "effects were compounded by hypertensive cardiovascular disease and physiologic stress associated with struggle and restraint by police").

After the Court converted the qualified-immunity aspects of the motion to dismiss to a motion for summary judgment, the individual defendants moved to file the previously-docketed video and its authenticating business records affidavit [Dkt. Nos. 28 & 27] as evidence in support of their summary judgment motion, *see* Dkt. No. 44, Plaintiffs did not oppose this request, *see id.*, and the Court granted the motion, *see* Dkt. No. 45. But when Plaintiffs later responded to the summary judgment motion, they failed to provide their own evidence, *see* Dkt. No. 52. And their amended complaint is not verified. *See* Dkt. No. 40.[3]

---

[3] *See also Falon v. Holly*, 480 F. App'x 325, 326 (5th Cir. 2012) (per curiam) ("[V]erified complaint[s] and other verified pleadings serve as competent summary judgment evidence." (citing *Hart v. Hairston*, 343 F.3d 762, 765 (5th Cir. 2003))); *see also, e.g., Mitchell v. Cervantes*, 453 F. App'x 475, 477-78 (5th Cir. 2011) (per curiam) ("Mitchell's allegations in his verified complaint serve as competent summary judgment evidence and suggest a possible constitutional violation. ... Based on Mitchell's proffered facts, the appellants' use of force was not made in a

The qualified immunity inquiry at this stage requires that the Court "accept the plaintiff's version of the facts (to the extent reflected by proper summary judgment evidence) as true." *Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 655 (5th Cir. 2004); *see Tolan*, 572 U.S. at 651 ("In articulating the factual context of the case, the Fifth Circuit failed to adhere to the axiom that in ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986))). But the only evidence before the Court that supports any version of the use-of-force incident is the video.

And, while Plaintiffs argue that the video itself cannot establish that the officers' conduct did not violate a federal constitutional or statutory right because it is "entirely silent," *e.g.,* Dkt. No. 52 at 10, Plaintiffs' failure to offer evidence to support their version of the facts removes this case from one in which, because the video is "'not dispositive,'" "the Court should assume that those events captured by the video occurred in the manner depicted by the video but 'resolve any remaining factual questions ... in [the nonmovants'] favor,'" *Blakely v. Kelly*, No. 3:16-cv-2801-K-BN, 2020 WL 890383, at *12 (N.D. Tex. Jan. 21, 2020) (quoting *Davidson v. AT&T Mobility, LLC*, No. 3:17-cv-06-D, 2019 WL 486170, at *2 (N.D. Tex. Feb. 7, 2019)), *rec. accepted,*

---

'good faith effort to maintain or restore discipline' and was not 'nontrivial' but disproportionate to any possible provocation. ... On Mitchell's allegations, as summarized by the district court, the appellants have not shown that their course of conduct was not objectively unreasonable under clearly existing law. Accordingly, they have not demonstrated that they are entitled to qualified immunity as a matter of law." (citations omitted)).

2020 WL 888522 (N.D. Tex. Feb. 24, 2020); *cf. Brothers*, 837 F.3d at 517 ("The district court ruled that there were genuine disputes as to material facts. The officers urge us to review the genuineness in light of the video evidence and *Harris*'s exception to the jurisdictional limitation. We agree with the plaintiffs, however, that the video evidence does not unequivocally disprove their version of events, which we therefore accept for purposes of this appeal." (footnote omitted)).

In sum, the version of events depicted by the video determines, for present purposes, whether any particular officer defendant violated Hutcheson's constitutional right to be free from excessive force. *Cf. Meadours*, 483 F.3d at 421-22.

The video depicts that Hutcheson behaved erratically as soon as entered the lobby, running through the front door and then slowing down to walk toward approximately ten civilians waiting on a row of benches in the lobby. After he appears to speak to them, as he then sits down, they all abruptly vacate the benches, scattering throughout the lobby. An officer appears at the upper right corner of the video. Some of the civilians who were on the benches notice the officer and point toward to Hutcheson. Hutcheson then gets up from the bench, and he and the officer walk toward each other. At this point, Hutcheson has only been in the lobby approximately 30 seconds.

Hutcheson and the officer appear to speak to each other. Hutcheson walks past the officer toward the information booth. Another officer emerges from the booth. He walks toward Hutcheson. The first officer places a hand on Hutcheson, who shrugs it off, walks back to the benches, and sits down. Both officers appear to speak to

Hutcheson, who appears to empty his pockets to presumably show that he is not armed. Two more officers enter the lobby. Hutcheson then stands up. And he and three of the officers walk toward the upper right corner of the screen, across from the booth. At this point, Hutcheson has now been in the lobby approximately two minutes.

Hutcheson then turns around, dropping his shoulder to pass through the officers, and stumbles back toward the middle of the lobby. He reaches the door, quickening his step as he does, but turns around to face the booth as one officer walks toward him from the area of the lobby proximate to the booth – and as the crowd in the lobby moves away from Hutheson and the approaching officer. That officer then apprehends Hutcheson, forcing him to the ground on his bottom. He then attempts to turn Hutcheson on to his stomach, but Hutcheson resists. The two other officers approach to assist in restraining Hutcheson, who appears to struggle against the officers, as he shifts from his stomach to his side. The three officers continue to attempt to handcuff Hutcheson, who continues to struggle, shifting from side to stomach and kicking his legs.

After approximately 90 seconds, the fourth officer enters the lobby and does place his foot on top of Hutcheson's foot. Hutcheson kicks back at one point, and the fourth officer does bend Hutcheson's legs toward his backside. Two new officers now approach. And it is apparent that, at this point – approximately five minutes after he first entered – Hutcheson is no longer resisting, as he lies cuffed on his stomach.

As depicted by the video, medical professionals arrive approximately five minutes later. CPR is initiated less than two minutes later, and the lobby is cleared.

CPR is continued until, after eight more minutes, paramedics arrive and continue administering CPR to Hutcheson.

As depicted by the video and from the perspective of a reasonable officer on the scene, the Court cannot find that any officer defendant used excessive force against Hutcheson, as the video reflects that he struggled at the moment he was physically restrained, continued to resist arrest once physically restrained, and that, prior to being physically restrained, Hutcheson evaded the three officers who had escorted him from the center of the lobby and was moving quickly toward the exit when he stopped, seconds before he was physically restrained.

The events depicted by the video played out rapidly. Hutcheson's erratic moves plausibly created an uncertain atmosphere that was likely also tense, as further shown by the bystanders' reactions to him. Notably, the video shows that officers initially tried to diffuse the situation by escorting Hutcheson away from the main lobby (and the civilian bystanders). Force was not used until Hutcheson reversed course, slipping past the officers and returning to the center of the lobby and toward the exit.

This determination, that Plaintiffs have not shown a constitutional violation, could end the qualified immunity analysis, as they have not carried their burden on the first prong. But, even if they had shown a constitutional violation, they also fail to carry their burden on the "clearly established" prong of this analysis.

As the legal standards set out above state, and as the Supreme Court and the Fifth Circuit have "repeatedly stressed" to lower courts, "[t]he 'clearly established' standard [ ] requires that the legal principle clearly prohibit the officer's conduct in the

particular circumstances before him. The rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' This requires a high "degree of specificity." *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (quoting *Saucier*, 533 U.S. at 202; *Mullenix*, 136 S. Ct. at 309); *see also id.* ("[C]ourts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" (quoting *Plumhoff*, 572 U.S. at 779)); *cf. Emmons*, 139 S. Ct. at 503 ("In this case, the Court of Appeals contravened those settled principles. The Court of Appeals should have asked whether clearly established law prohibited the officers from stopping and taking down a man in these circumstances. Instead, the Court of Appeals defined the clearly established right at a high level of generality by saying only that the 'right to be free of excessive force' was clearly established.").

Thus, Plaintiffs "must point to case law clearly establishing that [the officers] acted unreasonably based on facts similar to the particular circumstances they faced," *E.g., Hale v. City of Biloxi, Miss.*, 731 F. App'x 259, 264 (5th Cir. 2018) (per curiam) (the "particular circumstances" there: "the use of deadly force and a taser where a person suspected of a nonviolent crime ignores repeated warnings to keep his hands visible and step outside of a confined area when he knows the people warning him are armed police officers, even if they have not told him he is under arrest"); *see also Vann*, 884 F.3d at 310 ("It is [Plaintiffs'] burden to find a case in [their] favor that does not define the law at a 'high level of generality.'"); *cf. Valderas*, 937 F.3d at 389 ("[T]he

plaintiff bears the burden of demonstrating that a defendant is not entitled to qualified immunity." (citation omitted)).

They have not carried this burden. As set out above, Plaintiffs point to *Darden*, which they characterize as holding "that 'a police officer uses excessive force when the officer strikes, punches, or violently slams a suspect who is not resisting arrest.'" Dkt. No. 52 at 10 (citing *Darden*, 880 F.3d at 725-31).

But the particular circumstances in *Darden* were not those faced by the officers here. And the particular force applied in *Darden* was not the type of force used here. As the Fifth Circuit set out the factual background in its decision,

> [i]n 2013, the Fort Worth Police Department investigated claims that cocaine was being sold from a private residence. A magistrate judge issued a warrant that allowed the officers to enter the residence without first knocking and announcing themselves. On May 16, 2013, a large team of heavily armed police officers executed the warrant. Officer Snow was assigned to the entry team, which was tasked with breaking down the front door, entering the residence, and securing the premises. Officer Romero drove the van that transported the team to the residence. He was also assigned to stand guard near the front door while other officers entered the residence and arrested the people inside. Two other members of the team wore cameras on their helmets, which captured on video some but not all of the events that transpired as the warrant was executed.
>
> When the police first arrived at the house, the entry team broke down the front door with a battering ram, yelled that they were police, and ordered everyone to get down. A large man, later identified as Darden, was kneeling on the seat of a couch near the door when the officers first entered, and he immediately raised his hands in the air. Darden weighed approximately 340 pounds. Several other people were sitting and standing in a nearby dining room. As Officer Snow entered the residence, he reached out and ripped the shirt off Darden's back, apparently in an attempt to get Darden from the couch to the ground. The videos do not show what happened during the twenty-five seconds that followed, and there is conflicting testimony about what transpired. According to witnesses for the plaintiff, Darden "had no time to react" before "[h]e was thrown on the ground" by the officers. Witnesses also

testified that Darden never made any threatening gestures and did not resist arrest.

After approximately twenty-five seconds, it became apparent that some sort of incident was occurring in the front room. One of the videos shows Darden lying on the ground face up. An officer in the front room yelled, "Roll over on your face," at which point, Darden appeared to follow directions and rolled over onto his stomach. The video then pans away from the scene and does not turn back for approximately fifteen seconds. The second video shows that Officer Romero then ran into the house to assist. However, in that video, much of the interaction between Darden and the officers is totally obscured by the couch. Although not captured by the video, eyewitnesses testified that Officer Romero proceeded to choke Darden and to repeatedly punch and kick Darden in the face.

At one point, Darden's body appeared to come up off the ground for a moment, but it is not clear from the video footage whether he came up of his own volition or was pulled up by police. The officers then backed away, and Officer Snow used a Taser on Darden. Shortly thereafter, Darden rolled over onto his stomach and appeared to push himself up on his hands. He was immediately pushed back down into the ground by police. Throughout these events, other people in the house repeatedly yelled, "He's got asthma," and "He can't breathe." Eyewitnesses also testified that Darden himself told the officers he could not breathe.

A few seconds later, the videos briefly show Darden on his knees, with his hands in the air, before Officer Snow tased him a second time. Darden fell to the ground and rolled onto his back, where he lay face up for a few seconds. Officer Romero then pushed Darden over onto his stomach and pressed his face into the ground. As Officer Romero tried to pull Darden's left arm behind his back, Darden seemed to pull his arm away. The officers then pushed Darden back into the ground, and one officer appeared to put him in a choke hold.

At that point, other people in the residence were still yelling that Darden could not breathe. Nevertheless, several officers continued to push Darden's body into the ground face down, pressed his face and neck into the floor, and pulled his arms behind his back so that Officer Romero could handcuff him. As Officer Romero finished securing the handcuffs, Darden's body went limp. The officers then pulled Darden's debilitated body up into a sitting position and left him there. Darden appeared to be unconscious, and his head hung down on his chest. It was subsequently determined that Darden had suffered a heart attack and died.

*Darden*, 880 F.3d at 725-27 (footnoted omitted); *see also id.* at 731 ("We have previously

suggested that a constitutional violation occurs when an officer tases, strikes, or

violently slams an arrestee who is not actively resisting arrest. Thus, if a jury finds that Darden was not actively resisting arrest, then a jury could likewise conclude that Officer Snow used excessive force by throwing Darden to the ground and tasing him twice." (citations omitted)); *id.* at 732 ("As stated, we have found that a police officer uses excessive force when the officer strikes, punches, or violently slams a suspect who is not resisting arrest. Thus, if a jury finds that no reasonable officer on the scene would have perceived Darden to be actively resisting arrest, then a jury could also conclude that Officer Romero used excessive force by choking Darden and repeatedly punching and kicking him in the face." (citations omitted)).

First, "[a]ssuming without deciding that a court of appeals decision may constitute clearly established law for purposes of qualified immunity," *Emmons*, 139 S. Ct. at 503 (citing *Sheehan*, 135 S. Ct. at 1776), Plaintiffs make "no effort to explain how [*Darden*] prohibited [the officers'] actions in this case. That is a problem under [controlling] precedents:

> "[The Supreme Court has] stressed the need to identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment.... While there does not have to be a case directly on point, existing precedent must place the lawfulness of the particular [action] beyond debate.... Of course, there can be the rare obvious case, where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances.... But a body of relevant case law is usually necessary to clearly establish the answer...."

*Id.* at 503-04 (quoting *Wesby*, 138 S. Ct., at 581); *see also Kisela*, 138 S. Ct. at 1153 ("Precedent involving similar facts can help move a case beyond the otherwise 'hazy border between excessive and acceptable force' and thereby provide an officer notice

that a specific use of force is unlawful. 'Of course, general statements of the law are not inherently incapable of giving fair and clear warning to officers.' But the general rules set forth in "*[Tennessee v. Garner*, 471 U.S. 1 (1985),]* and *Graham* do not by themselves create clearly established law outside an 'obvious case.'" (citations omitted); *Morrow*, 917 F.3d at 876 ("[O]vercoming qualified immunity is especially difficult in excessive-force cases," as those "claims often turn on 'split-second decisions' to use lethal force. That means the law must be so clearly established that – in the blink of an eye, in the middle of a high-speed chase – every reasonable officer would know it immediately." (citation omitted)).

As the Court's description of the video shows, this is not an obvious case where every reasonable officer confronting the situation depicted by the video would know immediately that the force used against Hutcherson was unlawful, which means that, by failing to identify precedent with similar facts, Plaintiffs have not carried their burden as to the "clearly established" prong of qualified immunity.

In sum, the Court dismisses the excessive force claims with prejudice.

III.   State Wrongful Death Act

In their amended complaint, Plaintiffs' allegations implicating Texas's wrongful death statute are limited to the following:

> Plaintiffs are therefore entitled to bring, and do bring, this action under Chapter 71 of the Texas Civil Practice and Remedies Code, also known as the Wrongful Death Act of the State of Texas.
> As a result of this claim under the Wrongful Death Act, Plaintiff[s are] entitled to recover damages arising from the death of Joseph Hutcherson within the jurisdictional limits of this court [as further particularized.]

Dkt. No. 40, ¶¶ 5.26 & 5.27.

Defendants briefed these allegations "in an abundance of caution," Dkt. No. 41 at 30 ("It is unclear whether Plaintiffs' allegations support wrongful death damages pursuant to 42 U.S.C. § 1983, as allowed pursuant to state law, or whether Plaintiffs raise a state law wrongful death claim against Dallas County."), moving to dismiss such a claim against the individual defendants (under the statutory election-of-remedies provision) and against the County (as barred by governmental immunity), *see id.* at 30-31. And Plaintiffs, in their response, failed to address whether they are indeed bringing a separate state law wrongful death claim. *See generally* Dkt. No. 52.

But, to the extent that they do assert a state law wrongful death claim against the County and its employees, such a claim is dismissed with prejudice.

"Municipal governments are immune from tort suits except to the extent that immunity has been waived by the Texas Tort Claims Act ('TTCA')." *Hatcher v. City of Grand Prairie*, No. 3:14-cv-432-M, 2014 WL 3893907, at *7 (N.D. Tex. Aug. 6, 2014) (citations omitted). The TTCA "waives the state's immunity from suit in certain circumstances"; "covers all tort theories that may be alleged against a governmental entity whether or not it waives that immunity"; and provides that, "'[i]f a suit is filed under this chapter against both a governmental unit and any of its employees, the employees shall immediately be dismissed on the filing of a motion by the governmental unit.'" *Gil Ramirez Group L.L.C. v. Houston Indep. Sch. Dist.*, 786 F.3d 400, 415 (5th Cir. 2015) (quoting TEX. CIV. PRAC. & REM. CODE § 101.106(e); citation omitted).

"Although the TTCA waives immunity in certain limited circumstances, the waiver does not extend to claims 'arising out of assault, battery, false imprisonment, or any other intentional tort.'" *Hatcher*, 2014 WL 3893907, at *7 (citing TEX. CIV. PRAC. & REM. CODE § 101.021; then quoting TEX. CIV. PRAC. & REM. CODE § 101.057(2)); *see also Calhoun v. Vila*, 761 F. App'x 297, 300 (5th Cir. 2019) (per curiam) ("Texas law protects governmental entities from suit through sovereign immunity, unless the area of liability is specifically waived by the Texas Tort Claims Act, such as injury by an employee's motor vehicle, injury caused by property conditions, and claims arising from defects in premises. None of Calhoun's claims fall under these categories. Additionally, under Texas law, '[i]f a suit is filed ... against both a governmental unit and any of its employees, the employees shall immediately be dismissed on the filing of a motion by the governmental unit.' Therefore, Calhoun's state law claims against both governmental entities and individual defendants were properly dismissed." (citations omitted)).

## Conclusion

The Court GRANTS the motion to dismiss and converted motion for summary judgment as to qualified immunity [Dkt. No. 41] and therefore DISMISSES this action with prejudice and VACATES its previous order referring this case to mediation [Dkt. No. 35].

SO ORDERED.

DATED: April 7, 2020

_____
DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE